**BRISTOL BAY PRODUCTIONS, LLC, f/k/a Crusader Entertainment, LLC, Plaintiff–Appellant,**

v.

**Peter LAMPACK; Peter Lampack Agency, Inc.; Simon & Schuster, Inc.; and Penguin Group USA, Inc., Defendants–Appellees.**

**No. 10CA2039.**

Colorado Court of Appeals, Div. IV.

Nov. 23, 2011.

Rehearing Denied Jan. 26, 2012.

---

See also, 2010 WL 718007.

Rothgerber, Johnson & Lyons, LLP, Frederick J. Baumann, Jesús M. Vásquez, Jr., Denver, Colorado; O'Melveny & Meyers, LLP, Marvin S. Putnam, Los Angeles, California, for Plaintiff–Appellant.

Haddon, Morgan and Forman, P.C., Ty Gee, Denver, Colorado, for Defendants–Appellees Peter Lampack and Peter Lampack Agency, Inc.

Husch Blackwell, LLP, N. Reid Neureiter, Elizabeth L. Harris, Denver, Colorado, for Defendant–Appellee Simon & Schuster, Inc.

Dorsey & Whitney, Gregory Tamkin, Van Hughes, Denver, Colorado, for Defendant–Appellee Penguin Group USA, Inc.

Opinion by Judge DAILEY.

Bristol Bay Productions, LLC, formerly known as Crusader Entertainment, LLC (Bristol Bay), appeals the district court's judgment dismissing its tort action against defendants, Peter Lampack and Peter Lampack Agency, Inc. (together, Lampack); Simon & Schuster, Inc. (Simon & Schuster); and Penguin Group USA, Inc. (Penguin). We affirm the judgment and remand for further proceedings.

## I. Background

This case concerns the fallout from a failed attempt to convert one of author Clive Cussler's "Dirk Pitt" adventure novels into a commercially successful movie. Bristol Bay was the movie's producer; Lampack was Cussler's literary agent; and Simon & Schuster and Penguin were two of Cussler's publishers.

Bristol Bay and Cussler sued each other in California over the failed venture. During discovery, Bristol Bay learned that Cussler's fan base was not what it had been led to believe it was: only 40 million, and not 100 million, of Cussler's books had been sold. Bristol Bay added claims of deceit against Cussler, alleging that his or his agent Lampack's misrepresentation caused it to enter into a contract with Cussler and produce the movie *Sahara* at a loss in excess of $50 million.

Several weeks later, Bristol Bay filed the present action in Colorado against Lampack based on allegations nearly identical to those made in the California case. Bristol Bay later amended the complaint to add Simon & Schuster and Penguin, based on allegations that they misrepresented Cussler's readership, books in print, and books sold.[1]

The California jury returned verdicts in favor of Cussler on Bristol Bay's deceit claims. Upon defendants' motion, the Colorado court stayed its proceedings pending the outcome of an appeal in the California case.

Following the California Court of Appeal's affirmance of the judgment on Bristol Bay's deceit claims, *see Cussler v. Crusader Entertainment, LLC,* 2010 WL 718007, *1 (Cal.Ct. App. No. B208738, Mar. 3, 2010), the Colorado district court (acting through a different judge) granted, on issue preclusion grounds, defendants' C.R.C.P. 12(b)(5) motion to dismiss the complaint.

## II. Issue Preclusion

Bristol Bay contends that the district court erred in dismissing its complaint on issue preclusion grounds. We disagree.

### A. Overview

■ Issue preclusion is a question of law that we review de novo. *Stanton v. Schultz,* 222 P.3d 303, 307 (Colo.2010).

■ "The doctrine [of issue preclusion] is intended to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" *Bebo Constr. Co. v. Mattox & O'Brien, P.C.,* 990 P.2d 78, 84 (Colo.1999) (quoting *Salida Sch. Dist. R–32–J v. Morrison,* 732 P.2d 1160, 1163 (Colo.1987), and *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)).

■ Issue preclusion bars relitigation of a legal or factual matter already decided in a prior proceeding when:

(1) the issue sought to be precluded is identical to an issue actually and necessarily determined in a prior proceeding;

(2) the party against whom [preclusion] is asserted was a party to or is in privity with a party to the prior proceeding;

(3) there was a final judgment on the merits in the prior proceeding; and

(4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*In re Tonko,* 154 P.3d 397, 405 (Colo.2007).

■ As a practical matter, only the first element (that is, identity of issues) is in question on appeal. To satisfy this element, "[a] party must have actually litigated the issue in the prior proceeding and the adjudicatory body must have necessarily decided the issue." *Id.* "An issue is actually litigated and necessarily adjudicated when a party

---

1. In its amended complaint, Bristol Bay alleged claims of fraud in the inducement, fraudulent concealment, negligent misrepresentation, aiding and abetting fraud, conspiracy, and section 13–21–111.5(4), C.R.S.2011, common plan or design, against Lampack; and claims of fraudulent misrepresentation, fraudulent concealment, violation of the Colorado Consumer Protection Act, sections 6–1–101 to –1121, C.R.S.2011, and conspiracy, against the publishers.

properly raised the issue and a determination on that issue was necessary to the judgment." *Id.*

### B.   The District Court's Ruling

In granting defendants' motion to dismiss, the district court relied, to a great extent, upon the following analysis provided by another judge in resolving the motion to stay proceedings:

> [S]everal issues of fact germane to [Bristol Bay's] claims in the case at bar were actually litigated and were necessarily decided in the California action, and which resulted in final judgment at the trial court level . . ., in particular:
>
> 1.   The representation that Cussler had sold 100 million books was a false representation of important fact. . . .
>
> 2.   [Bristol Bay] reasonably relied upon this false book sales representation;
>
> 3.   [Bristol Bay's] reliance upon the false book sales representation did not cause [Bristol Bay] any injuries.
>
> . . . .
>
> While [Bristol Bay's] claims here are based on the alleged book sales misrepresentations of [Lampack and the two publishers] rather than those of Cussler, the Court sees no meaningful difference between the content of the misrepresentation of fact alleged here and those presented to the jury in the prior litigation.

### C.   Analysis

On appeal, Bristol Bay contends that the district court erred in determining that the California jury's findings on misrepresentation, reliance, and causation preclude it from proceeding here against Lampack and the publishers.

#### 1.   Cussler's Purported Deflection of Blame onto Others

Initially, Bristol Bay argues that the issue in this case could not be identical to that in the California case because Cussler defended himself in the California action, in part, by taking the very position that Bristol Bay advances here, that is, that his agent's and publishers' misrepresentations caused Bristol Bay to enter the contract and produce the movie.

In the California trial, Bristol Bay presented evidence that Cussler and his literary agent, Lampack, had said, during contract negotiations, that 100 million of Cussler's books had been sold. Bristol Bay also presented expert testimony that, at the time of those statements, the number of new books sold by Cussler was actually about 40 million.

To counter this testimony, Cussler presented testimony by Lampack which suggested that the accuracy of the "100 million" figure depended upon what it was describing, be it new book sales, books in print (also called books published), total book sales, or readership. According to Lampack, (1) the number of new book sales is the lowest number; (2) the number of books in print is significantly higher, since only some of the books printed are sold; (3) the number of total book sales is also higher than new book sales, since a single book can be resold multiple times; and (4) the total readership is the highest number, since a single book is often read by numerous people.

In presenting this testimony, Cussler did not cast blame on his agent and publishers, but instead showed how he, through his agent, collaborated with the publishers. Lampack testified that, of all the various figures, the publication figure was the most accurate, since he and the publishers collaborated to keep track of it. And Lampack conceded that when someone asked for a figure, he readily told them how many books Cussler had published. Indeed, Lampack even conceded that, on one occasion, he handed a Cussler book to a Bristol Bay employee to show the employee the publication figure printed on the book jacket.

In closing arguments, Cussler relied on Lampack's testimony for four defenses: (1) neither Cussler nor Lampack ever told Bristol Bay that 100 million of Cussler's books had been sold; (2) even if Cussler or Lampack had said "100 million books sold," Bristol Bay had not relied on that figure (i.e., in its reports, Bristol Bay employees cited readership and publication, not sales, figures); (3) if Cussler or Lampack had said "100 million

books sold," that statement was true, when one considers both new and used book sales; and (4) even if Cussler or Lampack had misrepresented the number of books sold, there was no evidence of damages (that is, there was no evidence that even one fewer person went to see this movie because Cussler had sold only 40, 50, or 80 million books, rather than 100 million books).

Thus, contrary to Bristol Bay's assertion, Cussler never argued that Bristol Bay entered into the contract based on the misrepresentations of Lampack or the publishers.

### 2. The Issues Resolved in the California Case

In special interrogatories, the California jury found that (1) Cussler misrepresented that he had sold 100 million books; (2) Cussler acted with knowledge and/or negligence as to the falsity of the statement; (3) Cussler intended to deceive and induce reliance by Bristol Bay; (4) Bristol Bay reasonably relied on Cussler's misrepresentation; but (5) Bristol Bay's reliance on Cussler's misrepresentation was not a substantial factor in causing harm.

Bristol Bay argues that the jury determined nothing about Lampack or his role in this case, nor, contrary to the district court's conclusion, did it determine that Bristol Bay actually relied on Cussler's misrepresentation.

#### a. Lampack

Nothing is explicitly stated about Lampack in the California jury's findings. However, when considered in light of the instructions given to the jury and the evidence adduced at trial, the jury's findings about Cussler necessarily pertain to Lampack as well.

The court instructed the jury as follows:

- "In dealing with each other while negotiating the terms of the parties' contract, both parties were represented by agents. Anything that these agents said

or did within the scope of their authority as agents will have the same legal effect as if it had been said or done by the party. Thus, if you find the agents made false representations while negotiating the contract, it is the same as if the parties themselves made those representations."

- "A party is responsible for harm caused by the wrongful conduct of its agents while acting within the scope of their authority."

- "If you find that the conduct of Peter Lampack ... harmed [Bristol Bay], you must decide whether Cussler is responsible for the harm. Cussler is responsible if [Bristol Bay] proves both of the following:

  1. That Peter Lampack ... was Cussler's agent; and,

  2. That Peter Lampack ... was acting within the scope of his ... agency when he ... harmed [Bristol Bay]."

- "If [Bristol Bay] proves that Cussler gave Peter Lampack ... authority to act on his behalf, then he ... was Cussler's agent. This authority may be shown by words or may be implied by the parties' conduct."

- "Each party must prove that an agent of the other party was acting within the scope of his or her authorization when the party was harmed." [2]

There is no dispute in the record about whether Lampack acted within the scope of his authority as Cussler's agent in making the representations that he did.[3] Lampack testified, as Cussler's witness, that he was Cussler's agent and that he negotiated Cussler's contract with Bristol Bay. Cussler never disavowed Lampack's testimony nor intimated that Lampack had acted outside his authority as Cussler's agent.

Given the instructions and the lack of any indication of a factual dispute as to Lam-

---

2. In this regard, the court instructed the jury: "Conduct is within the scope of authorization if: (a) It is reasonably related to the kinds of tasks that the agent was employed to perform; or (b) It is reasonably foreseeable in light of the employer's business or the agent's responsibilities."

3. Bristol Bay argues otherwise by pointing to a part of the record indicating only that Cussler may not have been aware of all of Lampack's acts or statements.

pack's role in this case, the jury's answers to interrogatories must be read as finding that (1) Cussler or his agent, Lampack, misrepresented that Cussler had sold 100 million books; (2) Cussler or his agent, Lampack, acted with knowledge or negligence as to the falsity of the statement; (3) Cussler or his agent, Lampack, intended to deceive and induce reliance by Bristol Bay; (4) Bristol Bay reasonably relied on the misrepresentation; but (5) Bristol Bay's reliance on the misrepresentation was not a substantial factor in causing harm.

### b. Bristol Bay's Reliance and Damages

Bristol Bay argues that, contrary to the district court's view, the California jury did not determine that Cussler's or Lampack's misrepresentation actually caused Bristol Bay to enter into the contract and produce the movie.

■ The California verdicts at issue concern intentional misrepresentation and negligent misrepresentation, two theories under which a California plaintiff can bring a tort action for deceit. The elements of a California deceit claim are (1) misrepresentation of a material fact (consisting of false representation, concealment, or nondisclosure); (2) scienter (for intentional misrepresentation, knowledge of falsity; for negligent misrepresentation, that there were "no reasonable grounds" for believing the truth of the matter asserted); (3) intent to deceive and induce reliance; (4) justifiable reliance on the misrepresentation; and (5) resulting damage. *See Conroy v. Regents of University of California*, 45 Cal.4th 1244, 91 Cal.Rptr.3d 532, 203 P.3d 1127, 1135–36 (2009) (listing elements of negligent misrepresentation claim); *Bower v. AT & T Mobility, LLC*, 196 Cal. App.4th 1545, 127 Cal.Rptr.3d 569, 579 (2011)(listing elements of intentional misrepresentation claim).

There is no dispute about the meaning of the jury's findings (except, as applied to Lampack) with respect to the first three elements. The dispute here is over what the jury found with regard to the last two elements, justifiable reliance and resulting damage.

In California law, justifiable reliance is broken down into objective and subjective components, that is, actual reliance and reasonable reliance. *See OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157 Cal.App.4th 835, 68 Cal.Rptr.3d 828, 855 (2007) (regarding "justifiable reliance," "[t]o establish this element of fraud, plaintiffs must show (1) that they actually relied on the defendant's misrepresentations, and (2) that they were reasonable in doing so"); *Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal.App.3d 1324, 231 Cal.Rptr. 355, 358 (1986) (though reliance is "one of the elements" of deceit, a plaintiff must show actual reliance and that the reliance was reasonable).

■ Actual reliance occurs when "the [mis]representation has played a substantial part, and so has been a substantial factor, in influencing [the plaintiff's] decision." Restatement (Second) of Torts § 546 (1977), *cited with approval in Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 938 P.2d 903, 919 (1997), *and OCM Principal Opportunities Fund*, 68 Cal.Rptr.3d at 855–56. Reasonable reliance is satisfied when "circumstances were such as to make it *reasonable* for [the] plaintiff to accept [the] defendant's statements without an independent inquiry or investigation." *OCM Principal Opportunities Fund*, 68 Cal. Rptr.3d at 856 (quoting *Wilhelm*, 231 Cal. Rptr. at 358).

Resulting damages is a wholly separate element from justifiable reliance. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343–44, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ("[T]he common law has long insisted that a plaintiff [bringing a tort claim for deceit] show not only that had he known the truth he would not have acted but also that he suffered actual economic loss."); *see also* Restatement (Second) of Torts § 548A illus. 1 (1977).

In the California case, the jury addressed these three topics (actual reliance, reasonable reliance, and damage causation) in its answers to two sets of interrogatories specific to its deceit claims:

QUESTION[S] NO. 39 [ & 50]: Did [Bristol Bay] reasonably rely on [Cussler's false] representation?

Please answer "Yes" or "No."

Answer _____

[The jury answered, "Yes."]

If your answer to Question 39 [ & 50] is yes, then answer Question 40 [& 51]. If you answered no, please go to Question 42 [& 52].

QUESTION[S] NO. 40 [& 51]: Was [Bristol Bay]'s reliance on Cussler's representation a substantial factor in causing harm to [Bristol Bay]?

Please answer "Yes" or "No."

Answer _____

[The jury answered, "No."]

According to Bristol Bay, contrary to the Colorado court's determination, the jury's "Yes" answer to interrogatories 39 and 50 did not reflect a finding that Bristol Bay had "actually" relied on misrepresentations by Cussler or his agent. Rather, the issue of "actual reliance" was contained in interrogatories 40 and 51, by virtue of their "substantial factor ... causing harm" language. Consequently, it argues, the jury's "No" answer to interrogatories 40 and 51 reflects a finding that Bristol Bay did not actually rely on Cussler's or his agent's misrepresentation, but rather upon something else (possibly the misrepresentations of others) in entering into the contract.

■ Bristol Bay rests its argument on a comparison of the wording of the special interrogatories with the wording of the "actual" and "reasonable" reliance definitions set forth in *Engalla* and *OCM Principal Opportunities Fund*. However, a jury's findings must ultimately be construed in light of the instructions the jury receives, and not in light of legal principles of which it is wholly unaware. *See People v. Martin*, 851 P.2d 186, 188 (Colo.App.1992) ("[A] verdict is to be reasonably construed in light of the issues submitted to the jury and the instructions of the court."); *People v. Camacho*, 171 Cal. App.4th 1269, 90 Cal.Rptr.3d 559, 561–62 (2009)(a verdict is construed "in light of the issues submitted to the jury and the instructions of the court").

The jury was not instructed on the *Engalla* and *OCM Principal Opportunities Fund* definitions of "actual reliance" and "reasonable reliance." Indeed, the instructions never referred to the phrases "actual reliance" or (except for the elemental instructions for the deceit claims) "substantial factor."

Instead, the jury was instructed that Bristol Bay's theory of the case was that Cussler's misrepresentation caused it to take the particular action of entering into a contract:

[Bristol Bay] claims that Cussler committed ... misrepresentation by representing [to] [Bristol Bay] personally or through his literary agent that Cussler had sold 100 million books when, in fact, [they knew or should have known that he had sold fewer books]. [Bristol Bay] claims it would not have entered into the contract without the representation.

And the jury was instructed that "reliance" is defined by reference to a party's actions:

A party relied on the other party's misrepresentation that [sic] if the misrepresentations caused it to take an action or refrain from taking an action and if it would probably have acted differently without the misrepresentation.

In addition, the jury was instructed that Cussler's misrepresentation need not have been the only factor, or even the only misrepresentation, that influenced Bristol Bay's decision to enter into the contract:

It is not necessary for the misrepresentations to be the only reason for the party's taking the action. It is enough if the misrepresentation substantially influenced the party's choice, even if it was not the only reason for his decision....

You may not find that a party relied on the alleged representations of the other party if you find.... [t]he party relied on the advice of some third person and not on any representations by the other party.

Finally, the jury was also instructed on reasonable reliance: "You must determine the reasonableness of a party's reliance by taking into account its knowledge, and experience."

In light of these instructions, we conclude that ordinary people would expect to address issues of *both* actual and reasonable reliance (however phrased) in interrogatories 39 and 50.

Our conclusion is further supported by the following three observations:

(1) The instructions defined reliance in terms of whether a misrepresentation "substantially influenced a decision," and not in terms of whether (as stated in interrogatories 40 and 51) Bristol Bay's "reliance was a substantial factor in causing harm" to Bristol Bay. (Read in context, the latter phrase connotes a causation, or proximate cause, concept unrelated to "actual" reliance.);

(2) "Actual" and "reasonable" reliance are not separate elements, but merely two components of a single element, *see, e.g., Wilhelm,* 231 Cal.Rptr. at 358, and a typical juror would expect to find these two components to be addressed in a single question; and

(3) Interrogatories 39 and 50 asked, "Did [Bristol Bay] reasonably rely on [Cussler's false] representation?" A logical paraphrase of this question is, "Did Bristol Bay rely on Cussler's false representation, and was such reliance reasonable?" It would be illogical, however, to construe the question in the manner advocated by Bristol Bay as asking only, "Would it have been reasonable for a hypothetical person in Bristol Bay's position to have relied on Cussler's false representation?"

For these reasons, we interpret the special verdict form the same way that the district court did. Accordingly, we conclude that the California jury found that Bristol Bay actually and reasonably relied on Cussler's or his agent Lampack's misrepresentations concerning book sales, but that its reliance on the misrepresentations was not a substantial factor in causing any of its alleged harm.

### 3. The Issues Precluded in the Current Litigation

#### a. Lampack

■ As we have interpreted them, the jury's findings preclude Bristol Bay from proceeding against Lampack in this action. This is because the California case decided, adversely to Bristol Bay, three issues identical to those present in the instant case.

In California, the parties litigated and the jury determined that either Lampack, when acting on Cussler's behalf, or Cussler himself misrepresented the number of books that Cussler had sold. The parties also litigated and the jury also determined that, although Bristol Bay relied on this misrepresentation when it entered into the contract with Cussler, this reliance was not a sufficient cause of harm to Bristol Bay as to support a claim for damages.

In its complaint, Bristol Bay did not assert that Lampack repeated the "books sold" representations following contract negotiations, made additional misrepresentations directly to Bristol Bay (e.g., about the number of books published or the number of Cussler's readers), or caused additional damages. Accordingly, the jury's finding about the lack of damages caused by Bristol Bay's reliance on Cussler's or Lampack's misrepresentation is preclusive of any attempt to now hold Lampack responsible, based on his misrepresentations, for those same damages. *See Scopia Mortg. Corp. v. Greentree Mortg. Co.,* 233 F.Supp.2d 625, 628 (D.N.J.2000) (where it was previously determined that a defendant's misrepresentations did not cause the plaintiff's damages, issue preclusion barred the plaintiff from bringing a claim concerning those same misrepresentations against that same defendant), *aff'd,* 56 Fed.Appx. 93 (3d Cir.2003); *cf.* Restatement (Second) of Judgments § 51(1) (1982) (stating the general claim preclusion rule that "[i]f two persons have a relationship such that one of them is vicariously responsible for the conduct of the other, and an action is brought by the injured person against one of them, ... [a] judgment against the injured person that bars him from reasserting his claim against the defendant in the first action [generally] extinguishes any claim he has against the other person responsible for the conduct").

#### b. The Publishers

■ As a general proposition, a finding that one defendant did not cause a plaintiff's

damages would not preclude a finding that a different defendant caused those same damages. *See Metropolitan Gas Repair Service, Inc. v. Kulik*, 621 P.2d 313, 319 (Colo.1980) (because three companies repaired a boiler in different ways and on different days, the finding that two of them did not cause plaintiff's injuries did not preclude a finding that the third company did cause the injuries); *cf. Schutzky Distributors, Inc. v. Kelly*, 643 F.Supp. 57, 61–62 (N.D.Cal.1986) (jury verdict was not inconsistent in awarding different damages based on different misrepresentations, as jury could have determined that the plaintiff relied more on some representations than on others).

But if a jury were to find that the defendant's conduct did not cause the plaintiff's damages, this finding would necessarily preclude the assertion that, by contributing to the cause of that same event or act, a second defendant caused the plaintiff's damages. *See Western Indus. & Environmental Services, Inc. v. Kaldveer Associates, Inc.*, 126 Idaho 541, 887 P.2d 1048, 1049–52 (1994) (after a determination in an action against equipment lender that the plaintiff's failure to timely complete a job was not caused by the defective equipment, the plaintiff was precluded from arguing, in a subsequent suit against the equipment's manufacturer, that the equipment defect caused the delay); *Kret v. Brookdale Hosp. Medical Center*, 93 A.D.2d 449, 459–60, 462 N.Y.S.2d 896 (N.Y.App.Div. 1983) (after a determination in an action against a physician that a birth defect was not caused by the type of medical condition that could have been detected and treated, the plaintiff was barred from bringing a subsequent action against a different physician

and the hospital), *aff'd*, 61 N.Y.2d 861, 473 N.Y.S.2d 970, 462 N.E.2d 147 (1984).

■ Here, Cussler's (or Lampack's) misrepresentation about the number of books sold substantially influenced Bristol Bay's choice to contract with Cussler and produce a movie, and Bristol Bay ultimately lost money on the contract and the movie. But the California jury found that there was no causal relationship between these two events: Bristol Bay's reliance on the misrepresentation was not a sufficient cause of any of its damages. Accordingly, Bristol Bay is precluded from arguing that reliance on anyone's misrepresentation about the number of Cussler's books sold caused its losses.[4]

Bristol Bay nonetheless argues that the California action cannot preclude certain aspects of its action against the publishers because, unlike in the California case, the publishers are alleged here to have made different misrepresentations (i.e., about the number of Cussler books published or the number of Cussler readers) at a different time (i.e., after Bristol Bay entered into the contract) and, consequently, caused different damages (i.e., post-contract misrepresentations caused Bristol Bay to invest more money in the movie).

Initially, we, like the district court, find no meaningful difference between misrepresentations about books sold and misrepresentations concerning books published, books read, or the number of Cussler readers. They are all simply different ways of getting at what was of critical significance to Bristol Bay, namely, the extent of Cussler's fan base.[5] *Cf. Eilrich v. Remas*, 839 F.2d 630,

---

4. Bristol Bay contests this result because the publishers' misrepresentations carry more weight (and, thus, a greater potential for causing damages) than Cussler's. The California jury, however, found that Bristol Bay reasonably relied on the misrepresentations of Cussler or his agent, based on the following argument made by Bristol Bay:

"Where do you think that 125 million in print [figure] came from? Peter Lampack. That figure is from Peter Lampack. He is the one who gets together with the publishers, particularly when you change publishing houses every so often, and says, how are you going to change the numbers and how much it has to go up. He is

the only person who knows. Why? He is the person who sells the foreign rights.
There is not one publishing house who sits there and does this worldwide. Peter Lampack sits at the hub of the wheel, okay. And then you have Great Britian and the U.S. You have all of the places where he sells the rights, gets the statements and then lets the publishers know what is in print. He makes up that figure. He makes up the sales figure."

5. Indeed, that is the very position that Bristol Bay's counsel took before the jury in California, when, in closing arguments, it asserted that the jury ought to, in effect, equate misrepresenta-

634–35 (9th Cir.1988) (where the plaintiff, in two actions, alleged he was discharged from his employment for making statements at a meeting, and the second action concerned statements only slightly different from those involved in the first, the court held that the second action was precluded: otherwise, "it would allow a party to evade collateral estoppel in a subsequent action by merely changing the statements to be considered, although they arise from the same factual circumstances and the legal standard requires an overall examination of those circumstances").

Regarding the alleged different timing of the publishers' misrepresentations, the Tenth Circuit Court of Appeals, in *B–S Steel of Kansas, Inc. v. Texas Industries, Inc.*, 439 F.3d 653, 663 (10th Cir.2006), characterized this type of issue as involving a "continuing course of conduct." In addressing an issue preclusion claim, it used the four factor test of Restatement (Second) of Judgments § 27 comment c ("Dimensions of Issue"):

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first? Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding? Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? How closely related are the claims involved in the two proceedings?

Applying the "course of conduct" factors identified in *B–S Steel,*[6] we conclude:

- There is substantial overlap in the evidence and argument presented in the two proceedings. As the publishers point out, Bristol Bay sought all its alleged post-contract damages in the California case. Thus, it is using the same

tions about books sold with misrepresentations about books published and readership.

**6.** The court in *B–S Steel* applied these factors to a continuing course of conduct even though, as here, issue preclusion was raised by defendants who were not parties to the earlier proceeding. *See B–S Steel,* 439 F.3d at 656 (issue decided

evidence of damages that it used in the prior case.

- The present case involves application of the same or similar rules of law as those involved in the prior proceeding.

- The pretrial preparation, discovery, and evidence presented in the first action embraced many of the matters sought to be presented here. As we have already noted, the various types of misrepresentations alleged here, the sources of those misrepresentations, and the post-contract damages were all placed in issue in the prior action. Further, all of the alleged post-contract misrepresentations were discoverable by Bristol Bay during the prior action, inasmuch as they were all public (available on the publishers' websites and book jackets) and had taken place before the California trial,[7] as the movie was released before trial.

- The claims concerning pre- and post-contract misrepresentations are very closely related. In this case, Bristol Bay alleged that, for the decade surrounding the contract, the publishers repeated essentially the same misrepresentations about Cussler's books sold, books in print, and readership. These misrepresentations were as available to Bristol Bay before it entered into the contract as they were thereafter, as the misrepresentations are alleged to have been on the publishers' websites and book jackets.

These factors support the application of the issue preclusion doctrine to bar relitigation of the causation issue previously determined in the California case.

Finally, we reject Bristol Bay's assertion that issue preclusion is inapplicable because damages from post-contract misrepresentations would, of necessity, differ from those flowing from pre-contract misrepresentations. In the California case, Bristol Bay

against the plaintiff in arbitration with one steel manufacturer could not be relitigated in suit against three other steel manufacturers).

**7.** Indeed, alleged misrepresentation(s) on book covers were introduced into evidence in the California case.

may have claimed its reliance was in entering into the contract, but it sought to recover its post-contract investment damages as well— the very same damages it seeks here in connection with post-contract misrepresentations.

In sum, we, like the district court, conclude that the issues raised in the two proceedings are virtually identical and were previously resolved against Bristol Bay, so as to preclude Bristol Bay from now going forward against the publishers.[8]

### III. Disposition Under Rule 12(b)(5) Rather Than Under Rule 56

Bristol Bay contends that the district court could dispose of the case as it did only as a summary judgment under C.R.C.P. 56, and not by a dismissal for failure to state a claim under C.R.C.P. 12(b)(5). According to Bristol Bay, by purporting to dispose of the case under Rule 12(b)(5), rather than under Rule 56, the court erroneously subjected it to an award of attorney fees under section 13–17–201, C.R.S.2011. We are not persuaded.

In *Ruth v. Department of Highways*, 153 Colo. 226, 385 P.2d 410 (1963), the supreme court held:

> To sustain the [affirmative] defense [of res judicata], facts in support of it must be affirmatively shown either by the evidence adduced at the trial, or by way of uncontroverted facts properly presented in a motion for summary judgment or by a motion to dismiss under Rule 12(b) ... where the court, on the basis of facts properly presented outside of the pleadings, is able to treat the same as a motion for summary judgment under Rule 56.

*Id.* at 229, 385 P.2d at 411–12.

Since that time, however, both the supreme court and divisions of our court have, in appropriate circumstances, upheld the dismissal of cases under Rule 12(b)(5) on affirmative defense grounds. *See, e.g., O'Neill v. Simpson*, 958 P.2d 1121, 1122–23 (Colo.1998) (involving issue and claim preclusion, discussed under their former names, collateral

estoppel and res. judicata); *Lavarato v. Branney*, 210 P.3d 485, 488 (Colo.App.2009) (involving statute of limitations).

██ Under our case law, affirmative defenses may be disposed of via Rule 12(b)(5) motions when the allegations of the complaint reveal that the claim is, as a matter of law, barred, *see Lavarato*, 210 P.3d at 488, or where allowing a disposition under Rule 12(b)(5) results in no prejudice to the plaintiff, *see Dave Peterson Elec., Inc. v. Beach Mountain Builders, Inc.*, 167 P.3d 175, 177 (Colo.App.2007) (claim preclusion).

In the present case, Bristol Bay's complaint does not reveal on its face that its claims are, as a matter of law, barred on issue preclusion grounds. In addition, Bristol Bay asserts that it was prejudiced by proceeding under Rule 12(b)(5) because, under section 13–17–201, attorney fees must be awarded when tort cases are dismissed under Rule 12. This is not, however, the type of "prejudice" to which the court in *Dave Peterson Electric* referred. In our view, the type of "prejudice" referred to in *Dave Peterson Electric* is the lack of a fair opportunity to litigate, and not to the attachment of an adverse consequence to an otherwise legitimate use of the Rule 12(b) procedure. *See Town of Carbondale v. GSS Properties, LLC*, 169 P.3d 675, 680 (Colo.2007) (prejudice, for purposes of whether an affirmative defense could be raised in a motion for summary judgment, concerned whether the plaintiff would have an opportunity to conduct adequate discovery and perform expert preparation).

Bristol Bay nonetheless argues that the district court was required to convert defendants' motion to dismiss into one for summary judgment because, when ruling on issue preclusion, the court considered information beyond what was contained in the complaint. Under the circumstances here, we are not persuaded.

██ In resolving a Rule 12(b)(5) motion, the court may consider only the facts alleged in the complaint, documents attached as ex-

---

**8.** This analysis would also preclude Bristol Bay from proceeding against Lampack on a conspiracy claim, that is, because Lampack conspired

with the publishers, he is vicariously liable to Bristol Bay for any damages caused by the publishers' misrepresentations.

hibits or referenced in the complaint, and matters of which the court may take judicial notice. *Walker v. Van Laningham*, 148 P.3d 391, 397 (Colo.App.2006); *Yadon v. Lowry*, 126 P.3d 332, 336 (Colo.App.2005). If the court considers other types of information, the court must treat the motion as one for summary judgment. *See* C.R.C.P. 12(b)(5) & (c); *Walker*, 148 P.3d at 396–97.

Here, Bristol Bay asserts that the district court improperly considered materials from the California case, including the pleadings, the closing summations of counsel, the jury instructions, the special verdict form, the trial court's judgment, and affidavits from counsel.

Initially, we note that, although affidavits of counsel were proffered in addition to the California court materials, the district court did not refer to any affidavits in resolving the case. Thus, whether the district court could decide the matter under C.R.C.P. 12(b)(5) depends on whether the court was allowed, consistent with that rule, to consider the California court materials.

A court can judicially notice facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." CRE 201(b). Accordingly, a court may take judicial notice of the contents of court records in a related proceeding. *People v. Linares–Guzman*, 195 P.3d 1130, 1135–36 (Colo.App.2008); *People v. Sa'ra*, 117 P.3d 51, 56 (Colo.App.2004). This is so even when the related proceeding was before another court. *Vento v. Colorado Nat'l Bank*, 985 P.2d 48, 52 (Colo.App.1999).

A court may not judicially notice facts on the matter that the parties are litigating. *Mun. Subdistrict v. OXY USA, Inc.*, 990 P.2d 701, 711 (Colo.1999); *In re C.A.B.L.*, 221 P.3d 433, 442 (Colo.App.2009). But this is not the case where, as here, a court examines trial transcripts, not for their truth, but only to determine what happened in a prior proceeding. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir.2001) ("[W]hen a court takes judicial notice of another court's opinion, it may do so 'not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reason-

able dispute over its authenticity.'" (quoting *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426–27 (3d Cir.1999))); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

Thus, courts in other jurisdictions have acknowledged that, when deciding a motion to dismiss for failure to state a claim on the basis of issue preclusion or claim preclusion, a court may judicially notice prior pleadings, orders, judgments, and other items appearing in the court records of the prior litigation. *See, e.g., Q Int'l Courier Inc. v. Smoak*, 441 F.3d 214, 216 (4th Cir. 2006) (claim preclusion); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F.Supp.2d 140, 144–45 (D.Conn.2005) (claim preclusion); *Rodgers v. Sargent Controls & Aerospace*, 136 Cal.App.4th 82, 38 Cal.Rptr.3d 528, 535 (2006) (issue preclusion).

Applying these principles here, we hold that the district court properly took judicial notice of the California court materials. Consequently, the district court could, and did, properly resolve the case under C.R.C.P. 12(b)(5), and Bristol Bay was liable for attorney fees under section 13–17–201.

### IV. Appellate Attorney Fees

Based on our disposition, we agree with Lampack and the publishers that they must be awarded reasonable attorney fees in defending this appeal. *See* § 13–17–201, C.R.S. 2011; *Cochran v. West Glenwood Springs Sanitation Dist.*, 223 P.3d 123, 127 (Colo. App.2009) (under section 13–17–201, party who successfully defends a dismissal on appeal is entitled to recover its reasonable attorney fees). The amount of fees shall be determined by the trial court. *See* C.A.R. 39.5.

The judgment is affirmed and the case is remanded for awards of appellate attorney fees to Lampack and the publishers.

Judge GRAHAM and Judge KAPELKE * concur.